[Cite as *State v. Kenney*, 2025-Ohio-4841.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                      :

    Plaintiff-Appellee,        :

                           No. 114553

    v.                         :

PETER A. KENNEY,                    :

    Defendant-Appellant.       :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 23, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-01-410438-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Tasha L. Forchione, Assistant Prosecuting
Attorney, *for appellee.*

Kimberly Kendall Corral and Katerina Bravos MacGregor,
*for appellant.*

EMANUELLA D. GROVES, P.J.:

{¶ 1} Defendant-appellant Peter A. Kenney ("Kenney") appeals the trial court's denial of his untimely and successive petition for postconviction relief under R.C. 2953.21 and 2953.23.  Upon review, we affirm.

## I. Facts and Procedural History

### A. Convictions, Postconviction Filings, and Prior Appeals

{¶ 2} In November 2001, a jury found Kenney guilty of aggravated murder and kidnapping, each accompanied by a firearm specification. Kenney was sentenced to life imprisonment with parole eligibility after 30 years on the aggravated-murder count and nine years on the kidnapping count, to be served concurrently. The trial court also sentenced Kenney to three years on each firearm specification, both to be served prior to and consecutive with the base sentences.

{¶ 3} Although witnesses saw or heard the shooting that culminated in Kenney's convictions, none were able to identify the shooter. Instead, the case against Kenney was based on his admissions — made to several individuals at different times — that he killed the victim. In Kenney's direct appeal of his convictions, this court made the following factual findings:

> The facts leading to this appeal arise from the execution-style killing of 17-year-old Terrence Robinson on April 17, 2001. Just before dawn on the 17th, police responded to a call about "gunshots in the area and a male down in the backyard" at 3370 W. 95th Street, Cleveland, Ohio.
>
> At trial, police officer Gary Helshel testified he was one of the first officers to arrive at the scene. Officer Helshel entered the backyard at 3370 W. 95th and discovered Robinson's partially nude and lifeless body face down. Detective Michael O'Malley described how Robinson was found clad in his underwear with other pieces of clothing strewn near his body.
>
> An autopsy revealed that Robinson had been shot seven times in different parts of his body. One close-range gunshot wound was found in the top of his head. The coroner testified that of the seven gunshot

wounds the one in the top of Robinson's skull was fatal. The coroner estimated that when that shot was fired, the gun was probably about 12 inches away from Robinson's head. The head wound was the last of the seven gunshot wounds Robinson endured. Before that shot, Robinson was still alive but had been immobilized by the six other bullets, several of them fired into his lower extremities.

Robinson was killed in the backyard of the house where Renee McBride lives. She told the jury that Robinson sometimes stayed at her house and that, as of the 17th, he had been living there for about a month. On the morning of the shooting, McBride testified she heard two gunshots, heard Robinson crying for help, and then heard four more shots.

Timmon Black, visiting at his girlfriend's house on W. 95th on the 17th, testified that he awoke when he heard gunshots around 4:00 a.m. Black described what he saw when he looked out the window towards McBride's backyard: "I saw two guys standing off to the side and then I saw the guy laying on the ground . . . and then a guy just popped out of nowhere like a ghost, came from around the other two guys . . . and shot him and they ran off." Black stated the man who came out of nowhere was "about a foot" away from Robinson when he fired the gun. Even though there was very little illumination, Black was able to identify the shooter as a white male because "as he jumped up to go away . . . the hood come back . . . you could see that white face in the dark." Lynette Schirger, who lives on W. 97th, testified that Kenney was known in the neighborhood as "Shorty." Schirger told the jury that when she awoke on the 17th between 10:00 a.m. to 11:00 a.m., Shorty, her friend, was visiting her live-in boyfriend, Daniel Fox. According to Schirger, Fox and some friends, including Kenney, had gone out the night before the shooting to get high. When she spoke with Kenney the next morning, Schirger stated that he was still "high." Schirger described her conversation with Kenney that morning:

> Q: He was still under the influence of whatever he had used?
>
> A: Yes.
>
> Q: Describe how you could tell that over and above the eyes?

A:  The slur of his speech, his eyes, his eyes just kept moving like he couldn't keep them still focused on one thing.  He just kept rolling them around and stuff.

Q:  Did Shorty say anything to you?

A:  He was all hyped up and he started talking about how he murdered the black boy.

Q:  Did he use the term black boy?

A:  No.

Q:  What term?

A:  He used the term n****

Q:  What exactly did Shorty say to you?

A:  That he murdered the n**** and that's what he deserved.

. . .

Q:  Did he use a name . . . did he say a name of the person he shot?

A:  Yeah.  I specifically asked who and he said Terrence.

. . .

Q:  What else does he say? Does he say where he did this?

A:  He didn't specifically say which backyard, he just said it was in a backyard.

Q:  What else did Shorty say other than it was in a backyard?

A:  That the kid was face down in a mud hole and that he was stripped down to his boxers.

Bothered by Kenney's statements, Schirger asked him to leave. Kenney remarked, "If you don't believe me watch the news." When Schirger watched the news, she did, in fact, see footage on Robinson's murder. Later, Schirger met with police and from a police photo array identified Kenney's photograph as that of Shorty.

Schirger's boyfriend, Daniel Fox, was called as a court witness. According to him, Kenney had arrived at the house in the early morning hours of the 17th. Two weeks after Robinson's murder, Fox gave a written statement to police in which he said he had gotten high with Kenney the night before Robinson's murder. When Kenney left that night he was so high he "could barely walk." Fox went to bed and was asleep when Kenney arrived at the house around 3:00 a.m. Fox opened the door and saw Kenney hand a gun to another person who was also standing outside with him. After entering the house, Kenney admitted to Fox he had killed Robinson. During examination by the state, however, Fox claimed police had threatened to charge him with Robinson's murder if he did not make the statement incriminating Kenney.

Bonnie Cozart also lived in the W. 95th neighborhood and knew Kenney. Two days after Robinson's shooting, Cozart spoke with Kenney and recalled that conversation to the jury:

> Q: Now, tell the jury, ma'am, what did he tell you that day, two days after this murder, what did he tell you?
>
> A: Okay. I stopped because I said, "Hey what's up, Shorty." He said, "Not much. Did you hear about what happened the other night?" I said, "What? The kid that got shot." He said, "Yeah." He said, "We shot him." I said, "Why did you do something like that?" "The kid pissed us off, so we shot him."

Cozart stated that, after this conversation, she did not see Kenney around the neighborhood at all.

Police eventually learned that, on the same day as Robinson's murder, Kenney had asked a friend to take care of his dog. Kenney's whereabouts remained unknown until on or about May 5, 2001, when he indicated a desire to surrender to police.

(Cleaned up and citations omitted.) *State v. Kenney*, 2003-Ohio-1501, ¶ 2-32 (8th Dist.) ("*Kenney I*").

{¶ 4} In *Kenney I*, Kenney argued that the trial court committed reversible error by allowing the State to impeach Fox with a prior written statement in which he said that Kenney admitted to killing Robinson. *Id.* at ¶ 35. Kenney further argued that the manifest weight of the evidence did not support his convictions. *Id.* at ¶ 41. This court affirmed Kenney's convictions, finding that the trial court did not abuse its discretion and "the manifest weight of the evidence clearly identifie[d] [Kenney] as the perpetrator of Robinson's death." *Id.* at ¶ 39, 49.

{¶ 5} While Kenney's direct appeal was pending, he filed a motion for new trial and petition for postconviction relief at the trial-court level in July 2002. *State v. Kenney*, 2003-Ohio-2046, ¶ 1 ("*Kenney II*"). Kenney claimed that he received "additional information" about another person's involvement in the homicide and asserted that (1) the trial court erroneously denied his request for a continuance to investigate exculpatory evidence; (2) the prosecutor failed to disclose exculpatory evidence; and (3) he received ineffective assistance from his trial counsel. *Id.* at ¶ 49-50. Kenney supported his petition with affidavits from a juvenile-detention-facility inmate, trial counsel, and himself. *Id.* at ¶ 46-49. The trial court denied Kenney's motion and petition and Kenney appealed those judgments.[1] *Id.* at ¶ 1.

---

[1] Kenney appealed each judgment separately. This court consolidated those appeals for purposes of review and disposition.

{¶ 6} In *Kenney II*, this court dismissed Kenney's appeal from the denial of his motion for a new trial, finding that Kenney's notice of direct appeal divested the trial court of jurisdiction to consider the motion. *Id*. at ¶ 58-59. We also affirmed the court's dismissal of Kenney's petition for postconviction relief, finding that the evidence discussed in the affidavits was in existence and available for use at the time of the trial. *Id*. at ¶ 51. Accordingly, we held that the issues raised in Kenney's petition should have been asserted at trial or on direct appeal and Kenney's claims were barred by res judicata. *Id*. at ¶ 51, 54-56. Kenney sought discretionary review in the Ohio Supreme Court, but the appeal was not accepted. *See State v. Kenney*, 2003-Ohio-4671.

{¶ 7} In June 2003, Kenney sought to reopen this court's judgment in *Kenney I,* alleging ineffective assistance of appellate counsel. We denied the application in *State v. Kenney*, 2004-Ohio-972 (8th Dist.). Kenney challenged our decision and the Ohio Supreme Court declined to accept the appeal for review. *See State v. Kenney*, 2004-Ohio-3580.

{¶ 8} Kenney then filed a petition for writ of habeas corpus in November 2004. Kenney claimed that the trial court violated due process by denying his request for a continuance and both trial and appellate counsel were ineffective. Kenney's petition for writ of habeas corpus was denied by the United States District Court for the Northern District of Ohio, which noted that the affidavits attached to his petition for postconviction relief addressed evidence that was already in the

record and Kenney had no evidence of actual innocence. *See Kenney v. Haviland*, 2006 U.S. Dist. LEXIS 69323, *26-27 (N.D. Ohio Sept. 26, 2006).

### B. Successive Petition for Postconviction Relief

{¶ 9} In June 2023, nearly 22 years after his convictions, Kenney filed a successive petition for postconviction relief. Kenney claimed that the prosecution failed to disclose material, exculpatory evidence that was favorable to his defense. Kenney asserted that several individuals gave statements to the police implicating other suspects in Robinson's shooting and that a detective knowingly concealed "a mountain of exculpatory information" when he testified at Kenney's trial. Kenney further claimed that newly discovered evidence invalidated the testimony of two key witnesses: Schirger and Cozart. Kenney asserted that this evidence established that Schirger was coerced and Cozart was "incompetent" and "not of sound mind at the time of her testimony." Kenney supported his petition with 30 exhibits, including:

- **Numerous police reports from April, May, September, October, and November 2001 and signed statements taken by detectives in May, August, and November 2001.** In his petition, Kenney claims that the reports and statements contain "undisclosed facts" and establish that police knew that other potential suspects confessed to several people that they killed or shot Robinson. Kenney asserts that these witnesses communicated the confessions to police prior to Kenney's trial but the State failed to share the information with the defense. Kenney also claims that a detective concealed this information while testifying about his investigation of Robinson's murder.

- **A police detail for another alleged shooter**, which Kenney uses to establish the individual's race and height.

- **An affidavit executed by Schirger and dated September 2022.** Therein, Schirger attested that she "made false statement

and testified untruthfully against [Kenney] because [a detective] threatened [her]." Schirger averred: "I don't remember all that I testified to because it wasn't the truth. Everything I stated on the stand was fed to me by [a detective]." Schirger further attested that she was "coming forward now with the truth because [Kenney] should not be in prison for a murder he did not commit." Schirger averred: "This has weighed heavily on my heart but at the time I felt I had no choice because I was afraid of [the detective] taking my son from me. I no longer have any reason to be afraid of [the detective]."

- **An affidavit executed by Cozart's husband and dated February 2023.** Therein, Cozart's husband attested that he "was not aware that [Cozart] testified" at Kenney's trial in 2001, was "recently informed . . . by an attorney working on behalf of [Kenney]," and "believe[d] that [Cozart] was not well enough to be a reliable witness" based on her "compromised mental state at the time."

- **An affidavit executed by Cozart's daughter and dated March 2023.** Therein, Cozart's daughter attested that she was contacted by one of Kenney's attorneys in May 2022 and she provided "information about [Kenney], about intimidation tactics the local police engaged in, and about [her] mother's mental illness." Cozart's daughter averred that she was "coming forward now because [she was] no longer afraid of retaliation."

- **The State's August 2001 response to discovery requests.** In his petition, Kenney claimed that the State's witness list attached thereto revealed that four individuals were not called to testify at Kenney's trial despite hearing the alternative suspects' confessions and providing that "exonerating information" to police.

- **An affidavit executed by Melanie Athey, a licensed private investigator ("the PI"), and dated February 2023.** Therein, the PI attested that she was hired in 2022 by Kenney's counsel to investigate his arrest and conviction. The PI averred that she interviewed several witnesses throughout the course of her investigation and that two shared information that she "believe[d] exonerate[d] [Kenney], but neither witness would provide an affidavit."[2] The PI then attested to the information she learned

---

[2] Interestingly, the PI attested that one witness "refused to sign a statement unless he was offered a benefit" while the other advised that he did not remember anything and claimed to be harassed and threatened after initially cooperating. According to the PI,

about these individuals, how and when she contacted them, and what she was told during their conversations. The PI averred that the information one witness shared with police "was not revealed during [Kenney's] trial."

- **An affidavit executed by a Hope Valentine ("Valentine") and dated September 2022.** Therein, Valentine attested that Kenney "was at Dino's house on the night [Robinson] was murdered. He was there when I went to sleep. He was there when I woke up. As far as I know he was there all night." Valentine averred that she told police about Kenney's whereabouts, "felt like [a detective] was threatening [her] to get [her] to say or write what he thought or felt to be true," and believed the "statement or police report with a so[-]called account of a conversation/interview with [her]" was "completely fabricated."

- **An affidavit executed by Matthew Miller ("Miller") and dated November 2022.** Miller attested that he and Kenney lived in the same neighborhood and hung out together often. Miller averred that he did not believe Kenney was responsible for Robinson's death because Kenney was not violent, he never saw Kenney carry a gun, and he did not believe Kenney would have been capable of running if he was using drugs that night.

- **An affidavit executed by Scott Stansell ("Stansell") and dated December 2022.** Therein, Stansell attested that he and Kenney used to be "very good friends." Stansell averred that he heard from others at home and while incarcerated that Kenney was not responsible for Robinson's murder. Stansell attested that Kenney was "incoherent" when he was high and would not have been capable of planning or carrying out a plan, shooting a gun, or running from the scene without leaving evidence behind if he was high. Stansell further averred that Kenney was not a violent person and he never saw Kenney handle or shoot a gun. Stansell attested that he "provid[ed] this affidavit because I believe that [Kenney] is innocent of [Robinson's] death."

- **A letter dated November 2001 from Kenney's trial counsel to an assistant prosecutor, advising that he interviewed a juvenile at the Juvenile Detention Center with the**

_____

that witness stated that he would not lie if he was called to court and would "'show the proof'" that Kenney's girlfriend offered to pay him in exchange for his help getting Kenney out of prison.

**juvenile's attorney.** Kenney's trial counsel wrote that he was informed that the juvenile heard the other alleged shooter confess to killing Robinson and name the other two persons involved in the homicide during a three-way telephone conversation and provided this information to a detective. Kenney's trial counsel stated, "At a previous pretrial you indicated that there was word on the street that [this individual] was the shooter but that there were no witnesses to substantiate that information. Apparently [the juvenile] may possess that information and he claims to have previously provided it to the police."

- **An affidavit executed by Bobbi Dickson ("Dickson") and dated November 2022.** Therein, Dickson attested to Kenney's whereabouts and condition the night before Robinson's murder as well as the events that transpired at Schirger's home. Dickson, who was fourteen at the time, averred that he wanted to tell police that Kenney could not have killed Robinson because Kenney was on the couch at Schirger's home all night but was forbidden from getting involved because his father was concerned about his safety. Dickson attested, "I have carried a lot of guilt about [Kenney] being convicted of [Robinson's] murder and want to offer my sworn statement of the events I witnessed."

Kenney argued that this "undisclosed information" was favorable to his defense and undermined the reliability of his conviction, concluding that the results of his trial would have been different had the evidence been disclosed. Kenney asserted that he was unavoidably prevented from discovering the evidence supporting his petition until a public records request was made for documents involving alternative suspects, the affiants came forward, and he was able to investigate further.

{¶ 10} The State opposed the petition, countering that Kenney repeatedly litigated the existence of additional suspects and merely repackaged those arguments as a *Brady* claim, alleging that the State failed to disclose evidence despite Kenney's trial counsel being aware of those facts all along. The State further

countered that Schirger, the purportedly coerced witness, was examined at trial regarding whether her statements were influenced by law enforcement. The State also noted that any alleged competency issues would have been evident in Cozart's trial testimony. Consequently, the State concluded that Kenney was not unavoidably prevented from learning about the supposed newly discovered evidence and his claims could have been raised on direct appeal or in his first petition for postconviction relief. The State supported its brief in opposition with an appendix of exhibits.

{¶ 11} While Kenney's successive petition for postconviction relief remained pending, the State filed multiple notices of supplemental authority, some of which Kenney opposed through replies or motions to strike. In October 2024, the trial court dismissed Kenney's petition for lack of jurisdiction. The trial court did not hold a hearing on the matter or detail its findings.

{¶ 12} Kenney appeals, raising seven assignments of error for review.

### Assignment of Error No. 1

The trial court abused its discretion when it unreasonably denied [Kenney's] petition, as evidence presented meets the requisite standard under [R.C. 2953.21 and 2953.23].

### Assignment of Error No. 2

The trial court abused its discretion as it acted unreasonably when it failed to hold an evidentiary hearing.

### Assignment of Error No. 3

The trial court abused its discretion as it acted unreasonably when it failed to weigh the credibility and materiality of the evidence presented.

## Assignment of Error No. 4

The trial court unreasonably abused its discretion as evidenced by failing to identify the correct legal standard or to state findings demonstrating its application of the correct legal standard.

## Assignment of Error No. 5

Failure to hold an evidentiary hearing to favor finality and judicial efficiency over [Kenney's] right to a fair trial is unconscionable abuse of judicial discretion.

## Assignment of Error No. 6

The trial court abused its discretion when it arbitrarily dismissed [Kenney's] petition without an evidentiary hearing or inclusion in its judgment of any findings or conclusions or law, shortly after the trial court was reprimanded for its delay by the Ohio Supreme Court at the request of [Kenney].

## Assignment of Error No. 7

The trial court's abuse of discretion is unconscionable when it is biased and supports a credibility determination that is favorable to the State while turning a blind eye to the State's *Brady* violation.

II.    **Law and Analysis**

**A. Petitions for Postconviction Relief and Jurisdiction**

{¶ 13} As the State notes in its appellate brief, each of Kenney's assignments of error hinge on whether the trial court had jurisdiction to adjudicate the merits of his untimely and successive petition for postconviction relief.  After thoroughly reviewing the record and relevant statutes and case law, we find that the trial court did not have jurisdiction to adjudicate the merits of Kenney's petition.

{¶ 14} Whether a trial court possesses subject-matter jurisdiction to entertain an untimely and/or successive petition for postconviction relief is a

question of law, which appellate courts review de novo. *State v. Scott*, 2024-Ohio-6211, ¶ 12 (8th Dist.), citing *State v. Apanovitch*, 2018-Ohio-4744, ¶ 24.

{¶ 15} "A petition for postconviction relief is a collateral civil attack of a criminal conviction." *Scott* at ¶ 7, citing *State v. Garrett*, 2024-Ohio-1367, ¶ 10-11 (8th Dist.). Since there is no constitutional right to a petition for postconviction relief, a defendant in such proceedings is entitled only to those rights expressly granted by the legislature. *Id.,* citing *id.* "That includes the right to have one's claim heard at all[.]" *Apanovitch* at ¶ 36. Indeed, ""[t]he most significant restriction on Ohio's statutory procedure for postconviction relief is that the doctrine of res judicata requires that the claim presented in support of the petition represent error supported by evidence outside the record generated by the direct criminal proceedings."" *State v. Brown*, 2025-Ohio-274, ¶ 39 (8th Dist.), quoting *State v. Lenard*, 2020-Ohio-1502, ¶ 10 (8th Dist.), quoting *State v. Monroe*, 2005-Ohio-5242, ¶ 9 (10th Dist.). Accordingly, any issues that were, or could have been, raised on direct appeal or in prior petitions for postconviction relief are barred by res judicata and are, therefore, precluded from review in any subsequent proceedings or successive petitions. *State v. Kennedy*, 2024-Ohio-66, ¶ 28-29 (8th Dist.).

{¶ 16} Pursuant to R.C. 2953.21(A)(1)(a), "[a]ny person who has been convicted of a criminal offense . . . and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States" may file a petition stating the grounds for relief relied upon and asking the sentencing court to vacate

or set aside the judgment or sentence or to grant other appropriate relief. When a direct appeal of a conviction is filed, a petition under R.C. 2953.21(A)(1)(a) must be filed no later than 365 days after the date that the trial transcript is filed in the court of appeals. R.C. 2953.21(A)(2).

{¶ 17} "[A] court may not entertain a petition filed after the expiration of the period prescribed in [R.C. 2953.21(A)] or a second petition or successive petitions for similar relief on behalf of a petitioner unless [R.C. 2953.23(A)(1) or (2)] applies." R.C. 2953.23(A). Relevant to this appeal, the R.C. 2953.23(A)(1) exception allows the trial court to consider an untimely or successive petition if both of the following conditions are met:

(a) Either the petitioner shows that the petitioner was unavoidably prevented from discovery of the facts upon, which the petitioner must rely to present the claim for relief, or, subsequent to the period prescribed in [R.C. 2953.21(A)(2)] or to the filing of an earlier petition, the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right.

(b) The petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted or, if the claim challenges a sentence of death that, but for constitutional error at the sentencing hearing, no reasonable factfinder would have found the petitioner eligible for the death sentence.

"[A] petitioner's failure to satisfy R.C. 2953.23(A) deprives a trial court of jurisdiction to adjudicate the merits of an untimely or successive postconviction petition." *Apanovitch*, 2018-Ohio-4744, at ¶ 36. A trial court has no duty to issue findings of fact and conclusions of law when it dismisses untimely or successive

petitions for postconviction relief. *State ex rel. George v. Burnside*, 2008-Ohio-2702, ¶ 6.

## B. The "Unavoidably Prevented" Standard

{¶ 18} In his successive and untimely petition for postconviction relief, Kenney does not claim that a new federal or state right applies retroactively. Therefore, we focus our analysis on whether Kenney demonstrated that he was unavoidably prevented from discovering the facts upon, which his claims for relief rely.

{¶ 19} To meet R.C. 2953.23(A)(1)(a)'s "unavoidably prevented" standard, defendants must ordinarily show that they (1) were unaware of the evidence now relied upon and (2) could not have discovered the evidence by exercising reasonable diligence. *State v. Bethel*, 2022-Ohio-783, ¶ 21. In *State v. Johnson*, 2024-Ohio-134, ¶ 17-18, 24, the Ohio Supreme Court reaffirmed that the burden of proof lies squarely on the shoulders of the petitioner filing an untimely or successive petition for postconviction relief and explained:

> R.C. 2953.23(A)(1)(a) requires a petitioner to show that he was "*unavoidably* prevented" — not merely "prevented" — from discovering the facts on which he would rely. (Emphasis added.) "Unavoidable" means "not avoidable" or "inevitable." *Merriam-Webster's Collegiate Dictionary* 1360 (11th Ed.2003). And something is "inevitable" if it is "incapable of being avoided or evaded." *Id.* at 638. Keeping in mind that R.C. 2953.23 means what it says, a petitioner filing an untimely postconviction petition must show that any delay in discovering the facts undergirding the petition was "incapable of being avoided or evaded." *Merriam-Webster's Collegiate Dictionary* at 638.

As it relates to witness recantation, the *Johnson* Court held that "R.C. 2953.23(A)(1)(a) requires a petitioner to submit evidence of specific facts beyond the supporting affidavit's date to explain why the petitioner was unable to timely obtain an affidavit from a recanting witness." *Id.* at ¶ 27 (finding that the petitioner did not carry his burden under R.C. 2953.23 where a recanting witness's affidavit did not (1) contain any details regarding when and how he first notified the petitioner about his misgivings; (2) shed light on whether the recanting witness contacted the petitioner or vice versa or when such contact occurred; and (3) provide any information about whether the petitioner had been prevented, unavoidably or otherwise, from timely discovering the recanting witness's uncertainties).

{¶ 20} In his petition, Kenney asserts that the State's case against him was only supported by the testimony of two witnesses — Schirger and Cozart — whose testimony was recently discovered to be unreliable. Kenney claims that newly discovered evidence invalidates their testimony. We find that Kenney has not demonstrated that he (1) was unaware of the evidence now relied upon and (2) could not have discovered the evidence by exercising reasonable diligence.

{¶ 21} First, we address the affidavit of Schirger, the recanting witness. We note that Schirger avers in her affidavit: "I was asked on the witness stand in [j]uvenile [c]ourt if the police threatened me with withholding evidence and I told them that I was threatened with charges. I felt like no one cared because nothing was done, and the threats by [the detective] continued." Kenney further acknowledges in his petition that Schirger testified in juvenile court that "police told

her that she could be arrested for aiding and abetting or harboring a criminal when they questioned her" and that she "backtracked [at Kenney's trial] and asserted she had lied." Therefore, alleged theories of potential police coercion were admittedly known to Kenney before his trial, addressed at trial, and could have been raised on direct appeal.

{¶ 22} We further note that absent from Schirger's affidavit is any information regarding the specific circumstances that led her to recant her prior testimony, execute the affidavit, and provide it to Kenney. Schirger vaguely states that she was "coming forward now with the truth because [Kenney] should not be in prison for a murder he did not commit"; this "weighed heavily on [her] heart but at the time [she] felt [she] had no choice because [she] was afraid of [the detective] taking [her] son"; and she "no longer ha[d] any reason to be afraid of [the detective]."

{¶ 23} Schirger's affidavit provides no information regarding when she specifically decided to recant her testimony, whether Kenney or others acting on his behalf played a role in that decision, what prior communications she had with Kenney or his representatives regarding her testimony, at what point Kenney learned of her willingness to come forward with the recantation, who prepared the affidavit she executed, how and when the affidavit came into Kenney's possession, and why Kenney could not have discovered her recantation within the required timeframe by exercising reasonable diligence. Kenney did not provide any affidavits

from himself or anyone else detailing these facts or identifying when and under what circumstances he learned that Schirger recanted her trial testimony.

{¶ 24} Next, we turn to the affidavits regarding Cozart's purported incompetence and Kenney's alleged innocence. Kenney's claim that Cozart "did not have the soundness of mind required to be a competent witness" is based solely on the affidavits of Cozart's husband and daughter and is unsupported by any other evidence, including medical records or professional opinions. These affidavits contain several statements suggesting that Cozart's alleged mental-health issues were well-known, including to Kenney, and that Kenney and Cozart were not "close" — a fact that Kenney certainly would have known before trial. Cozart's husband averred that Cozart "had several profound mental health issues" and "did not have a close relationship with [Kenney]." He also attested that Kenney "would never have shared [incriminating] information with [Cozart]" because she was "not the type of person anyone would have opened up to or confided it." Cozart's daughter echoed these sentiments, attesting that Cozart and Kenney "did not have the kind of relationship that would lead to [him] confessing a crime to her" and that Kenney "knew she was crazy." Cozart's daughter averred that her "mother's behavior was extreme" and "anyone who knew her knew that she was reckless and unreliable."

{¶ 25} Kenney also provided affidavits from Valentine, Miller, Stansell, and Dickson, who attested to their relationships with Kenney, Kenney's whereabouts and condition after using drugs, their beliefs about Robinson's murder and Kenney's noninvolvement, and their experiences with local police.

{¶ 26} None of these affidavits — from Cozart's husband and daughter nor Valentine, Miller, Stansel, and Dickson — demonstrate that Kenney was unaware of the affiants, the information contained in the affidavits, or the fact that the affiants were willing to provide sworn statements. Nor do the affidavits provide any information about whether Kenney was unavoidably prevented from discovering the details contained therein. While Kenney argues that he was "unavoidably prevented from discovering this new evidence until the affiants came forward," there is no evidence in the record detailing Kenney's efforts, if any, to timely obtain the affidavits or establish why those efforts would have been unsuccessful. Thus, we find that Kenney's successive and untimely petition for postconviction relief contains conclusory assertions — unsupported by affidavits or other evidence — that he was unavoidably prevented from discovering this "new evidence" within the prescribed time frame.

### C. *Brady* Claims

{¶ 27} In his successive and untimely petition for postconviction relief, Kenney also argues that the State committed *Brady* violations, claiming that it failed to disclose material exculpatory evidence.

{¶ 28} In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The evidence encompassed by *Brady* includes impeachment and

exculpatory evidence, as well as evidence known only by police investigators and not the prosecutor, that was suppressed by the State either willfully or inadvertently. *State v. Addison*, 2024-Ohio-5805, ¶ 20 (8th Dist.), citing *Strickler v. Greene*, 527 U.S. 263, 280-282 (1999). A *Brady* violation is established when a defendant shows that "'the favorable [but suppressed] evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" (Brackets in original.) *Id*. at ¶ 21, quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

{¶ 29} The Ohio Supreme Court has reconciled the burden of proof prescribed by R.C. 2953.23(A)(1)(a) with the dictates of *Brady*, holding that the petitioner's burden of proof is modified but not eliminated by such claims. *Johnson,* 2024-Ohio-134, at ¶ 17 (examining *Bethel,* 2022-Ohio-783). The Ohio Supreme Court explained that because defendants are entitled to rely on the prosecution's affirmative duty to produce evidence favorable to the defense, defendants seeking to assert *Brady* claims are not required to show that they could not have discovered suppressed evidence by exercising reasonable diligence. *Bethel* at ¶ 25. Rather, defendants satisfy the "unavoidably prevented" requirement in the context of an alleged *Brady* violation by establishing that the prosecution suppressed the evidence on which they now rely. *Id*.

{¶ 30} In his petition, Kenney asserts that he was deprived of police reports in existence at the time of his trial that included information favorable to the defense, namely, witness statements that someone other than Kenney was responsible for Robinson's murder. Kenney also claims — while conceding that the

detective was "asked general, open-ended questions about his investigation in the Robinson murder case" — that a detective knowingly concealed information by omitting it from his testimony about Robinson's murder investigation. In her affidavit, the PI ambiguously avers that the information one witness shared with police "was not *revealed during* [Kenney's] trial," and Kenney maintains that these "previously undisclosed facts" only became available to him in late 2021 or early 2022, following a public-records request. (Emphasis added.)

{¶ 31} However, this court has repeatedly held that there is no requirement that contents of police reports and additional evidence referenced therein be made available and known directly to a defendant prior to his trial. *State v. Whatley*, 2024-Ohio-4909, ¶ 14 (8th Dist.), citing *State v. Dye*, 2024-Ohio-3191, ¶ 26 (8th Dist.). We explained: "Defendants are not generally 'privy to the exchange of discovery,' and as a result, these types of claims depend on the knowledge of trial counsel or the State's concession." *Id.*, quoting *id.* Accordingly, a defendant's "'unverified belief that his counsel was unaware of the existence or contents of the police report[s] before trial'" and "'"[u]nsubstantiated, self-serving allegations"'" are insufficient to demonstrate that the State suppressed the evidence at issue, especially for the purposes of establishing the unavoidably prevented prong of the analysis for belated petitions for postconviction relief. *Id.*, quoting *id.* at ¶ 27-28, quoting *State v. Walter*, 2020-Ohio-6741, ¶ 9 (8th Dist.), and *State v. Hill*, 2019-Ohio-365, ¶ 70 (1st Dist.).

{¶ 32} Kenney provided no affidavits or other evidence detailing how and when he learned about the existence of the police reports, signed statements, and information contained therein; establishing that the police records were, in fact, suppressed; and explaining why he, his attorneys, or his private investigator could not have discovered this "new evidence material to his defense" sooner. Rather, the record reveals that Kenney was exploring alternative-suspect theories prior to trial and continued to raise the issue both at the trial-court level and in prior appeals. Accordingly, we find that evidence incorporated into Kenney's untimely and successive petition for postconviction relief does not establish that the disputed evidence was suppressed. *See, e.g., Kennedy*, 2024-Ohio-66, at ¶ 39-40 (8th Dist.) (finding there was no evidence attached to the petitioner's successive petition for postconviction relief to suggest that police reports were not disclosed by the State during the discovery process utilized at the time of the petitioners trial and noting, for example, that trial counsel did not aver that the defense did not know about the police reports before trial or that the reports, if disclosed, would have been incorporated into the petitioner's defense); *State v. Anderson*, 2025-Ohio-1254, ¶ 13 (8th Dist.) (finding that the petitioner failed to establish that the State suppressed evidence on which he relied where he failed to indicate when and how he obtained the police reports and excluded any affidavits from people with firsthand knowledge, including himself, to support his claim that he never received them).

{¶ 33} Finally, we note that Kenney claims in his petition that his appointed private investigator and trial counsel were unable to interview several witnesses or

secure an alibi and other evidence despite their best efforts. Kenney's claims regarding the necessity of additional time to investigate alternative suspects were previously addressed when Kenney challenged the trial court's denial of his motion for continuance. Therefore, these arguments are barred by res judicata.

{¶ 34} Based on the foregoing, we find that Kenney failed to withstand his burden of proving that he was unavoidably prevented from discovering the evidence within the statutory deadline or that the State suppressed evidence.[3] Thus, the trial court was deprived of jurisdiction to entertain Kenney's successive and untimely petition for postconviction relief. Accordingly, the trial court did not err in denying Kenney's R.C. 2953.23 petition and had no duty to hold a hearing or issue findings of fact and conclusions of law under R.C. 2953.21. Kenney's assignments of error are overruled.

{¶ 35} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

---

[3] Because the R.C. 2953.23(A)(1) exception only allows the trial court to consider an untimely or successive petition for postconviction relief if *both* R.C. 2953.23(A)(1)(a) and (b) are satisfied, and we find that Kenney has not met the conditions set forth in R.C. 2953.23(A)(1)(a), we need not determine whether Kenney's petition fulfilled R.C. 2953.23(A)(1)(b)'s requirements.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

EMANUELLA D. GROVES, PRESIDING JUDGE

MARY J. BOYLE, J., and
KATHLEEN ANN KEOUGH, J., CONCUR