[Cite as *State v. Jones*, 2026-Ohio-1455.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO, :

    Plaintiff-Appellee, :

                          No. 115535

v. :

MIKE JONES, :

    Defendant-Appellant. :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 23, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-01-411588-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Gregory J. Ochocki, Assistant Prosecuting Attorney, *for appellee.*

Patituce & Associates, LLC, Megan M. Patituce, and Joseph C. Patituce, *for appellant.*

DEENA R. CALABRESE, J.:

{¶ 1} Defendant-appellant Mike Jones appeals the trial court's denial of his combined untimely and successive petition for postconviction relief and his motion for leave to file a motion for new trial. Finding no merit to the appeal, we affirm.

## I. History

### A. Factual Background and Direct Appeal

{¶ 2} This case involves the August 15, 2001 shooting death of 12-year-old W.C. The Cuyahoga County Grand Jury returned an indictment charging Jones with one count of murder in violation of R.C. 2903.02 with a three-year firearm specification pursuant to R.C. 2941.145. In November 2001, the case was tried to a jury, which returned a guilty verdict. The trial court sentenced Jones to a term of imprisonment of 15 years to life, to be served consecutively to a three-year term on the firearm specification.

{¶ 3} On direct appeal, this court overruled all of Jones's 13 assignments of error and affirmed his convictions. That 2002 opinion summarized the facts as follows:

> The record reflects that on August 15, 2001, a white Chevrolet carrying several men drove down E. 120th Street and stopped at the intersection of E. 120th Street and Kelton Avenue alongside Hurlon Hill, who was sitting on a bicycle at that intersection. A male from the vehicle asked Hill: "Are you Rockland?" When Hill answered affirmatively, the male said: "Y'all killed my dude." Hill, aware that a Rockland member had killed someone, became concerned that the males in the vehicle were looking to retaliate against Rockland for that killing. He jumped off his bike, yelling "dudes coming", and ran to 11811 Kelton Avenue, a Rockland hangout, alerting Mike Jones, Sundiata Langford, and Jujuan Norman, all of whom were present at that time. The Chevy then drove past 11811 Kelton Avenue, swung around squealing its tires and headed back to the intersection at E. 120th Street, swerving to hit Hill's abandoned bicycle, and continuing north on E. 120th Street. Jones, Langford, and Norman, having each grabbed a gun, began shooting in the direction of the car.
>
> Meanwhile, three children, [W.C., J.K., Jr., and R.W.], sitting on the porch of [W.C.]'s house on East 120th Street, near the Kelton intersection, watched these events. [W.C. and R.W.] walked down the

street to get a better view. When [L.S.], [W.C.]'s sister, heard the squeal of car tires and gunshots, she called the boys and they quickly ran inside. A bullet then came through the wall of the home, struck 12-year-old [W.C.] in the back, and lodged in his skull, killing him.

A forensic test later showed that the bullet had entered the house from the direction of Kelton Avenue. In addition, the police described the bullet recovered from his body as a 7.62 round of ammunition. They later recovered a 7.62 shell casing from 11815 Kelton Avenue, the property immediately adjacent to 11811.

When describing the incident to the police, Jones, Langford, and Norman each admitted firing a weapon from 11811 Kelton in the direction of the white car, but none admitted to using a weapon capable of firing a 7.62 round of ammunition.

Thereafter, a grand jury indicted Jones, Norman, and Langford for the murder of [W.C.], charging that they caused the death of [W.C.] as a proximate result of committing or attempting to commit an offense of violence that is a felony of the first or second degree, in violation of Section 2903.02 of the Revised Code. The indictment also included a three year firearm specification for Jones.

At their joint trial, Hill testified for the state that the day after the shooting, Jones told him that the guys in the white car fired shots at him, and he, Langford, and Norman fired back.

Detective Denise Kovach read a written statement which Jones had given to the police. In this statement, Jones claimed that after Hill came running down the street screaming about the approaching vehicle, he grabbed his gun which had been hidden under some weeds and dirt in the driveway of the house at 11811 Kelton. He stated that two males hanging out of the white vehicle shot at him and Norman, and continued to shoot while the vehicle proceeded to the intersection of E. 120th Street and Kelton. He stated that he had used a .22 pistol, which he disposed of the next day. He also stated that the males in the white vehicle were from the Bloods and the shooting related to retaliation[.]

*State v. Jones*, 2002-Ohio-6045, ¶ 1-7 (8th Dist.) ("*Jones I*"). Jones filed an

application to reopen the appeal. This court denied the application in *State v. Jones*,

2003-Ohio-4397 (8th Dist.). Jones appealed to the Ohio Supreme Court, which declined jurisdiction. *State v. Jones*, 2003-Ohio-6458.

## B. First Petition for Postconviction Relief

{¶ 4} Jones filed his first petition for postconviction relief on September 23, 2002. He claimed that his trial counsel was ineffective in failing to interview and call an alibi witness, Darryl Martin. Jones alleged that Martin, who supplied an affidavit, would have served as an alibi witness who saw Jones and his codefendants running in the opposite direction before the shooting began.

{¶ 5} The trial court denied Jones's first petition for postconviction relief without a hearing, and this court affirmed in *State v. Jones*, 2004-Ohio-3868 (8th Dist.) ("*Jones II*"). In short, this court concluded that trial counsel's decision not to call Martin was a trial tactic. As already discussed above, Jones "himself had made a statement to the police that he had fired a gun at the white car carrying the rival gang members," claiming "that he was shooting in self-defense." *Id*. at ¶ 13. This court further explained:

> [Martin] claimed in his affidavit that he saw [Jones] running away before any shots were fired. [Jones's] own admission that he had fired shots at the rival gang contradicts the witness's statement. The affidavit therefore weakens the self-defense argument which was the basis of defendant's case. The attorney would have jeopardized defendant's self-defense alibi if counsel presented a different theory.

*Id*. at ¶ 14.

## C. First Motion for Leave to File a Motion for New Trial

{¶ 6} On October 29, 2014, Jones filed a motion for leave to file a motion for new trial. He supported the motion for leave with his own affidavit, in which he

contradicted the 2002 Darryl Martin affidavit and reverted to the story he told police, i.e., that he fired at the white car in self-defense using a .22-caliber pistol. Jones claimed in his affidavit that he saw "a guy . . . hanging out the back window [of the white vehicle] brandishing a weapon and then shots were fired," after which he "returned fire." (Oct. 7, 2014 Jones affidavit at ¶ 8-9.)

{¶ 7} Jones also alleged that when he gave a statement to police the next day he "turned over the .22 automatic pistol [he] fired the night before[.]" (Oct. 7, 2014 Jones affidavit at ¶ 13.) We note that Jones's signed statement is actually dated August 20, 2001, five days after the shooting. At that time, Jones indicated that he "got rid of" the .22-caliber pistol "the next day" by giving it to a Rayshawn Black. The latter account is consistent with the trial testimony summarized in this court's 2002 opinion. A detective, referring to the August 20, 2001 statement, testified that Jones indicated "that he had used a .22 pistol, which he disposed of the next day." *Jones I* at ¶ 7.

{¶ 8} The trial court denied the motion for leave by entry dated November 17, 2014. Jones appealed, but on January 6, 2015, this court dismissed his appeal for failure to file a praecipe.

## D. Application for DNA Testing

{¶ 9} On November 18, 2021, Jones filed an application for DNA testing of the spent 7.62-caliber shell casing, which the State opposed. The trial court granted the motion after a hearing. After testing, however, Jones's counsel notified the trial court that no further action would be pursued with respect to test results.

### E. Untimely, Successive Petition for Postconviction Relief and Motion for Leave to File Motion for New Trial

{¶ 10} On February 21, 2025, Jones filed the combined untimely, successive motion for postconviction relief and motion for leave to file motion for new trial ("Successive PCR and Motion for Leave") that is the subject of his appeal. His supporting brief contained a two-page list of exhibits followed by 76 pages of exhibits. Jones essentially concedes that virtually all of these exhibits related to matters that could have, or in fact were, explored at trial, in trial court proceedings following his conviction, or on appeal. For example, exhibit No. 1 is the September 2002 Darryl Martin alibi affidavit that was the subject of Jones's unsuccessful petition for postconviction relief in 2002, i.e., the affidavit comprehensively addressed in *Jones II*. The Successive PCR and Motion for Leave also includes many exhibits available at the time of trial, including neighborhood maps, various dated police reports, the statements given by Jones and his codefendants, contemporaneous news articles, and the State's initial and supplementary discovery responses.

{¶ 11} The brief in support of the Successive PCR and Motion for Leave likewise explores many arguments made, or that could have been made, in a timely fashion. These include various references to the layout of the neighborhood, arguments concerning purported witness accounts as summarized by journalists in articles published before trial, criticism of police work regarding the search for the alleged rival gang members in the white vehicle, arguments that the jury made a bad

decision in rejecting Jones's self-defense theory, and criticisms of the State's position at trial regarding the merits of his self-defense theory.

{¶ 12} We agree with the State that the only arguably relevant materials attached to the Successive PCR and Motion for Leave, i.e., materials allegedly unavailable to Jones prior to the deadline for filing a timely petition for postconviction relief or timely motion for new trial, are a November 20, 2001 interoffice memorandum authored by a Cuyahoga County assistant prosecuting attorney and an October 23, 2024 affidavit from an individual identified as Larissa Taylor. These items, attached to the Successive PCR and Motion for Leave as exhibit Nos. 23 and 24 respectively, were Jones's sole focus at oral argument. Importantly, Jones does not argue that any of the other exhibits attached to his Successive PCR and Motion for Leave were previously unavailable to him and that he was unavoidably prevented from discovering them.

{¶ 13} Exhibit No. 23, an interoffice memorandum authored by an assistant prosecutor, did not directly concern Jones's case. It instead addressed whether capital murder charges should be pursued in the case of *State v. Freeman*, Cuyahoga C.P. No. CR-01-410924. Sammon addressed the memorandum to William D. Mason, the Cuyahoga County prosecuting attorney at the time, with copies to seven additional individuals, none of whom appeared as trial counsel in Jones's case. In addressing whether Freeman (not Jones) should face capital murder charges, Sammon wrote, inter alia:

You should know that [Freeman] is really bad. He has another capital case pending (CR410993). Please be further advised that this defendant's friends were responsible for the death of a 12 year old [W.C.], who was killed when a bullet penetrated his house. The defendants in that case were friends of Freeman who returned fire when friends of one of the victims in Freeman's other capital case shot at a Thurlin Hill, another friend of Freeman's who happens to be a State's witness in this case.

{¶ 14} Exhibit No. 24 is Taylor's affidavit. She avers that she was present for the shooting, that she saw gunshots from the white vehicle, and that she was never interviewed by police or prosecutors. She claims in her affidavit that at the time of the shooting, she had been scared to come forward.

{¶ 15} The State opposed Jones's Successive PCR and Motion for Leave, arguing that Jones had failed to establish that he was unavoidably prevented from discovering the referenced materials within the relevant deadlines and that his Successive PCR and Motion for Leave was barred by the doctrine of res judicata.

{¶ 16} The trial court denied Jones's Successive PCR and Motion for Leave. Applying the same basic doctrines governing both an untimely motion for postconviction relief and a motion for leave to file an untimely motion for new trial, the trial court principally concluded that "[t]here was no evidentiary basis provided for the Court to reliably [conclude] that Defendant was unavoidably prevented from gathering the allegedly exculpatory evidence at the time of trial." (July 14, 2025 journal entry at p. 2.)

{¶ 17} This timely appeal followed.

## II. Assignments of Error

{¶ 18} Jones presents three assignments of error for our review:

ASSIGNMENT OF ERROR 1: The trial court abused its discretion in denying Mr. Jones's Post-Conviction Petition because Mr. Jones established his rights were violated, he was unavoidably prevented from timely discovery of the evidence, and no reasonable factfinder would have found Mr. Jones guilty.

ASSIGNMENT OF ERROR 2: The trial court erred in concluding that Mr. Jones's Post-Conviction Petition was barred by res judicata.

ASSIGNMENT OF ERROR 3: The trial court abused its discretion in denying Mr. Jones's Motion for Leave filed pursuant to Crim.R. 33.

{¶ 19} For ease of discussion, we address Jones's assignments of error out of order. We find no merit to appellant's first and third assignments of error. As explained more fully below, we overrule Jones's second assignment of error in part and find that the assignment of error is in all other respects moot.

## III. Standards of Review

### A. Untimely, Successive Petition for Postconviction Relief

{¶ 20} R.C. 2953.21 through 2953.23 govern petitions for postconviction relief. Such a petition "'is a collateral civil attack on their criminal conviction.'" *State v. Jackson*, 2025-Ohio-2363, ¶ 24 (8th Dist.), quoting *State v. Kennedy*, 2024-Ohio-66, ¶ 23 (8th Dist.), citing *State v. Gondor*, 2006-Ohio-6679, ¶ 48.

{¶ 21} Pursuant to R.C. 2953.21(A)(1)(a)(i), any person who has been convicted of a criminal offense and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States may file a petition in the court that imposed sentence stating the grounds for relief relied upon and asking the court to vacate or set aside the judgment or sentence or to grant other

appropriate relief. A petitioner may file a supporting affidavit and other documentary evidence in support of their claim for relief. R.C. 2953.21(A)(1)(b). *See also Jackson* at ¶ 25. "A postconviction petition, however, does not provide a petitioner a second opportunity to litigate the conviction." *Kennedy* at ¶ 23.

{¶ 22} The right to file a petition for postconviction relief arises from statute, not a constitutional right. *Jackson* at ¶ 24, citing *State v. Apanovitch*, 2018-Ohio-4744, ¶ 35, and *State v. Broom*, 2016-Ohio-1028, ¶ 28. Accordingly, "[a] postconviction petitioner . . . 'receives no more rights than those granted by the statute.'" *Apanovitch* at ¶ 35, quoting *State v. Calhoun*, 86 Ohio St.3d 279, 281 (1999). "That includes the right to have one's claim heard at all[.]" *Apanovitch* at ¶ 36.

{¶ 23} A petitioner seeking postconviction relief "has a limited time within which to do so." *State v. Johnson*, 2024-Ohio-134, ¶ 9. "A trial court generally has no jurisdiction to consider an untimely or successive petition." *Id.* at ¶ 1. R.C. 2953.21(A)(2) provides that a petition for postconviction relief shall be filed within 365 days from the filing of the trial transcripts in the petitioner's direct appeal or, if a direct appeal was not pursued, 365 days after the expiration of time in which a direct appeal could have been filed.[1] "A trial court does not have subject-matter jurisdiction to adjudicate a postconviction petition that is untimely — i.e., filed

---

[1] At the time of Jones's convictions, the deadline for filing a petition for postconviction relief was 180 days, not 365. *See* former R.C. 2953.21(A)(2), 2010 Sub.S.B. No. 77. The shorter deadline makes no material difference in this case. Jones's successive, untimely petition was filed well after either statutory deadline.

outside the statutory deadline under R.C. 2953.21(A)(2) or successive — i.e., a second or subsequent petition." *Johnson* at ¶ 10, citing *Apanovitch* at ¶ 36, 38.

{¶ 24} R.C. 2953.23(A)(1) and (2), however, provide "exceptions to this jurisdictional bar." *Id.* As in Johnson, "[o]ne is relevant here." *Id.* at ¶ 10. Specifically:

> [a] trial court may entertain an untimely or successive petition if "the petitioner shows that the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief" and "[t]he petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty."

*Id.* at ¶ 10, quoting R.C. 2953.23(A)(1)(a) and (b).[2] As the Ohio Supreme Court stated in *Apanovitch*:

> R.C. 2953.23(A) provides that "a court *may not entertain* a petition filed after the expiration of the period prescribed in [R.C. 2953.21(A)] or a second petition or successive petitions for similar relief on behalf of a petitioner unless" one of the exceptions in R.C. 2953.23(A) applies. (Emphasis added.) Therefore, *a petitioner's failure to satisfy R.C. 2953.23(A) deprives a trial court of jurisdiction to adjudicate the merits of an untimely or successive postconviction petition.*

(Emphasis added.) *Apanovitch* at ¶ 36. *See also Kennedy*, 2024-Ohio-66, at ¶ 27 (8th Dist.) ("Because the timeliness requirement of R.C. 2953.23 is jurisdictional, a trial court does not have jurisdiction to entertain an untimely filed petition for

---

[2] Here, as in *Johnson*, Jones does not claim that "the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation[.]" R.C. 2953.23(A)(1)(a). *See Johnson* at ¶ 10, fn. 2. He therefore must "show that he was 'unavoidably prevented' from discovering the facts upon which he must rely to present his claim for relief." *State v. Orr*, 2025-Ohio-5514, ¶ 39 (8th Dist.), quoting R.C. 2953.23(A)(1)(a).

postconviction relief that does not meet the exceptions set forth in R.C. 2953.23(A)(1).").

{¶ 25} We ordinarily review a trial court's decision granting or denying a petition for postconviction relief under an abuse-of-discretion standard. *Jackson* at ¶ 28. "However, whether the trial court possessed subject-matter jurisdiction to entertain a petition for postconviction relief is a question of law subject to de novo review." *Kennedy* at ¶ 30, citing *Apanovitch* at ¶ 24. *See also Johnson* at ¶ 11; *State v. Bethel*, 2022-Ohio-783, ¶ 20. "In a de novo review, we review the merits of the case independently, without any deference to the trial court." *Kennedy* at ¶ 30, citing *Sosic v. Stephen Hovancsek & Assocs., Inc.*, 2021-Ohio-2592, ¶ 21 (8th Dist.).

## B. Crim.R. 33(B) Motion for Leave to File Motion for New Trial

{¶ 26} A motion for leave to file a motion for new trial is governed by Crim.R. 33. As this court recently explained:

> Crim.R. 33(A)(6) allows a trial court to grant a new trial where "new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial" and the defendant's "substantial rights" are "materially" "affect[ed]."
>
> A defendant whose case was tried to a jury must file a motion for a new trial based on newly discovered evidence within 120 days after the jury's verdict; otherwise, leave of court to file a motion for new trial must be sought and granted. To obtain leave to file an untimely motion for a new trial, the defendant must show "by clear and convincing proof" that he or she was "unavoidably prevented" from discovering the evidence and filing a timely motion for a new trial within the 120-day period. Crim.R. 33(B). Thus, a motion for leave must demonstrate two things: (1) that the defendant has obtained what constitutes newly discovered evidence; and (2) that the defendant was "unavoidably prevented" from timely discovering that evidence.

"Clear and convincing" evidence is that "measure or degree of proof" that "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. "It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." (Emphasis deleted.) *Id.* at 477.

*State v. Smith*, 2024-Ohio-1360, ¶ 46-48 (8th Dist.).

{¶ 27} A trial court evaluating a motion for leave under Crim.R. 33(B) "may not consider the merits of the proposed motion for a new trial unless and until it grants the motion for leave." *Id.* at ¶ 49, citing *State v. Hatton*, 2022-Ohio-3991, ¶ 30, 33, and *Bethel* at ¶ 41. Accordingly, the sole question before the trial court when considering a motion for leave based on newly discovered evidence is whether the defendant has established, by clear and convincing proof, "that he or she was *unavoidably prevented* from discovering the evidence on which he or she seeks to base the motion for a new trial within the time frame provided, e.g., *within 120 days of the jury's verdict*." (Emphasis added.) *Smith* at ¶ 49, citing *Hatton* at ¶ 30 and *State v. Hale*, 2023-Ohio-3894, ¶ 20 (8th Dist.). "In order to meet this burden, the defendant must present 'more than a mere allegation that he [or she] was unavoidably prevented from discovering the evidence he [or she] seeks to introduce to support a new trial.'" *State v. Hubbard*, 2020-Ohio-2726, ¶ 29 (8th Dist.), quoting *State v. Cowan*, 2020-Ohio-666, ¶ 10 (8th Dist.), citing *State v. Bridges*, 2016-Ohio-7298, ¶ 20 (8th Dist.). *See also State v. McFarland*, 2022-Ohio-4638, ¶ 17 (8th Dist.); *Smith* at ¶ 49.

**{¶ 28}** "'The "unavoidably prevented" requirement in Crim.R. 33(B) mirrors the "unavoidably prevented" requirement in R.C. 2953.23(A)(1).'" *Bethel* at ¶ 59, quoting *State v. Barnes*, 2018-Ohio-1585, ¶ 28 (5th Dist.). *See also Johnson* at ¶ 16, fn. 3. We therefore must apply the "unavoidably prevented" analysis in the Crim.R. 33(B) context as in the postconviction-relief context. *State v. Allen*, 2024-Ohio-970, ¶ 33 (8th Dist.), citing *Bethel* at ¶ 59.

**{¶ 29}** "We review both a trial court's decision on a motion for leave to file an untimely motion for a new trial and a trial court's decision whether to hold an evidentiary hearing on a motion for leave for abuse of discretion." *Smith* at ¶ 52. A trial court "abuses its discretion when it exercises its judgment in an unwarranted way with respect to a matter over which it has discretionary authority." *Hunter v. Troutman*, 2025-Ohio-366, ¶ 64 (8th Dist.), citing *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. "The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Hunter* at ¶ 64, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983). *See also State v. McAlpin*, 2026-Ohio-148, ¶ 14. "However, 'courts lack the discretion to make errors of law, particularly when the trial court's decision goes against the plain language of a statute or rule.'" *McAlpin* at ¶ 14, quoting *Johnson* at ¶ 39. Accordingly, "[w]e review questions of law de novo." *McAlpin* at ¶ 14, citing *Johnson* at ¶ 38.

## IV. Analysis

### A. First Assignment of Error – Postconviction Relief

{¶ 30} In his first assignment of error, Jones argues that the trial court abused its discretion in denying his untimely, successive petition for postconviction relief because he established that his rights were violated, that he was unavoidably prevented from timely discovery of the evidence, and that no reasonable factfinder would have found him guilty. As noted above, the only items attached to his Successive PCR and Motion for Leave that he claims he was unavoidably prevented from timely discovering are the prosecutor's interoffice memorandum and the potential testimony of Larissa Taylor. We address each item in turn.

#### 1. The Interoffice Memorandum

##### a. The "Unavoidably Prevented" Standard and Jones's *Brady* Argument

{¶ 31} The United States Supreme Court, in *Brady v. Maryland*, 373 U.S. 83 (1963), "recognized that the prosecution has an affirmative duty to disclose evidence that is favorable to the accused and material to the accused's guilt or punishment." *State v. Dye*, 2024-Ohio-3191, ¶ 23 (8th Dist.), citing *Brady* at 87. This "duty encompasses impeachment evidence as well as exculpatory evidence," and "it encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Strickler v. Greene*, 527 U.S. 263, 280-281, 286 (1999), quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). Furthermore, "[t]he *Brady* rule applies regardless of whether evidence is suppressed by the State willfully or inadvertently." *Dye* at ¶ 23, citing *Strickler* at 282.

{¶ 32} "In *Banks v. Dretke*, 540 U.S. 668, 695 (2004), the Supreme Court of the United States explained that criminal defendants have no duty to 'scavenge for hints of undisclosed *Brady* material.'" *Bethel*, 2022-Ohio-783, at ¶ 24. Accordingly, "[s]ince the decision in *Banks*, multiple federal circuit courts and other state supreme courts have repudiated the imposition of any due-diligence requirement on defendants in *Brady* cases." *Bethel* at ¶ 24. In other words, as the Ohio Supreme Court explained in *Bethel*, because "a defendant is entitled to rely on the prosecution's duty to produce evidence that is favorable to the defense," a defendant "seeking to assert a *Brady* claim . . . is not required to show that he could not have discovered suppressed evidence by exercising reasonable diligence." *Bethel* at ¶ 25. Therefore, "when a defendant seeks to assert a *Brady* claim in an untimely or successive petition for postconviction relief, the defendant satisfies the 'unavoidably prevented' requirement contained in R.C. 2953.23(A)(1)(a) by establishing that the prosecution suppressed the evidence on which the defendant relies." *Bethel* at ¶ 25.

{¶ 33} In *Johnson*, 2024-Ohio-134, the Ohio Supreme Court examined its ruling in *Bethel* and "reconciled the burden of proof prescribed by R.C. 2953.23(A)(1)(a) with the dictates of *Brady*, holding that the petitioner's burden of proof is modified but not eliminated by such claims." *State v. Kenney*, 2025-Ohio-4841, ¶ 29 (8th Dist.), citing *Johnson* at ¶ 17. As the Ohio Supreme Court wrote in *Johnson*:

> Properly understood, *Bethel* reconciles the burden of proof in R.C. 2953.23(A)(1) with the dictates of *Brady*. *What Bethel does not do is eliminate a petitioner's burden of proof.* Nor could this court have

done so. *The General Assembly chose to place the burden of proof squarely on the shoulders of postconviction petitioners* such as Johnson by enacting the requirement that "the petitioner show[] that the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely," R.C. 2953.23(A)(1)(a).

Holding as *Johnson* would have us do — that the petitioner does not bear that burden — would transmogrify the statute. Thus, we reaffirm today that a petitioner who files an untimely or successive petition for postconviction relief under R.C. 2953.21 bears the burden of showing that he was unavoidably prevented from discovering the evidence on which the petition relies. A petitioner may make the required showing either by establishing a violation under *Brady*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, or by demonstrating that he was previously unaware of the evidence on which the petition relies and could not have discovered it by exercising reasonable diligence.

(Emphasis added.) *Johnson* at ¶ 17-18.

{¶ 34} In short, "because defendants are entitled to rely on the prosecution's affirmative duty to produce evidence favorable to the defense, defendants seeking to assert *Brady* claims are not required to show that they could not have discovered suppressed evidence by exercising reasonable diligence." *Kenney* at ¶ 29, citing *Bethel* at ¶ 25. Instead, a defendant may "satisfy the 'unavoidably prevented; requirement in the context of an alleged *Brady* violation by establishing that the prosecution suppressed the evidence on which they now rely." *Id.*, citing *Bethel* at ¶ 25.

{¶ 35} We acknowledge that Jones was not required to search for suppressed evidence, that "[t]he duty to disclose applies to impeachment evidence and encompasses evidence known to the police but not to prosecutors[,]" and that the duty to disclose "also applies whether the evidence was suppressed by the State willfully or inadvertently." *State v. Anderson*, 2025-Ohio-1254, ¶ 11 (8th Dist.),

citing *Dye*, 2024-Ohio-3191, at ¶ 23 (8th Dist.), *Bethel*, 2022-Ohio-783, and *Strickler*, 527 U.S. at 280-281, 286 (1999). Jones, however, was still required "to establish that the State suppressed the evidence on which he relies, as is necessary for a *Brady* claim." *Anderson* at ¶ 16.

{¶ 36} In *Anderson*, the petitioner argued "that he had not received police reports that included statements from the State's key witnesses that allegedly contradicted their trial testimony." *Anderson* at ¶ 10. Similar to Jones, Anderson also argued in the alternative that "if his attorney did have the reports, he was ineffective for failing to use them to impeach those witnesses at trial." *Id.* at ¶ 10. This aspect of *Anderson* is relevant to Jones's attempt to cover all bases here, where he includes a claim of ineffective assistance of counsel in apparent hopes of an end-run around any affidavit requirement. In short, he argues that he wins whether his trial attorney had the interoffice memorandum or not because it was either suppressed in violation of *Brady* or his trial counsel had it and was ineffective in not using it. This court rejected this species of argument in *Anderson*, expressly noting the ineffective-assistance argument but rejecting the petition based on the same flaw that is fatal to Jones's petition, i.e., the lack of affidavits establishing that he never received the items relied upon:

> Anderson vacillates between claiming that he never received exculpatory evidence contained in police reports and claiming that if his lawyer had those reports, he failed to use them at trial. *Additionally, Anderson failed to indicate when and how he obtained the reports and excluded any affidavits from people with firsthand knowledge, including himself, to support his claim that he never received the reports.* Unsubstantiated and self-serving allegations are

insufficient to establish entitlement to an evidentiary hearing. *State v. Walter*, 2020-Ohio-6741, ¶ 9 (8th Dist.). Based on the foregoing, we cannot find that Anderson established that the State suppressed the evidence on which Anderson relies.

(Emphasis added.) *Anderson* at ¶ 13. This court concluded that Anderson, having failed to establish under *Brady* that the State suppressed the evidence on which he relied, "failed to meet the requirement under R.C. 2953.23(A)(1)(a) necessary to obtain the jurisdiction of the court." *Id*. at ¶ 16. Accordingly, this court declined to "consider the requirements of R.C. 2953.23(A)(1)(b) because both sections (a) and (b) are necessary." *Id*. at ¶ 16.

{¶ 37} Similarly, in *Dye*, the petitioner failed to establish that his trial counsel was unaware of the contents of certain police reports and witness statements. This court wrote that "[b]ecause appellant may not have been privy to the exchange of discovery, *his claim depends on his trial counsel's knowledge*." (Emphasis added.) *Id*. at ¶ 26. This court continued:

> While appellant alleges that his counsel "would have discussed it with [him]" or would have provided him with it, appellant failed to substantiate such a claim beyond his self-serving speculation. He merely offers his unverified belief that his counsel was unaware of the existence or the contents of the police report before trial because he "thinks" they would have talked to him about an additional witness statement and he is "certain" that they would have shown the police report to him or discussed it with him.

*Id*. at ¶ 26. This court then reiterated that "'[u]nsubstantiated, self-serving allegations are not sufficient to demonstrate entitlement to an evidentiary hearing.'" *Id*. at ¶ 27, quoting *State v. Walter*, 2020-Ohio-6741, ¶ 9 (8th Dist.). It contrasted Dye's petition to those offered in other cases, including *Bethel*, where the petitioner

had offered affidavits of trial counsel indicating they did not know about certain evidence prior to trial, and *Hale*, 2023-Ohio-3894 (8th Dist.), in which this court wrote that "[m]ost significantly, the motion for leave [was] supported by the affidavits of Hale's former trial counsel . . . and former postconviction counsel[.]" *Id.* at ¶ 37.

{¶ 38} Likewise, in *Kennedy*, 2024-Ohio-66 (8th Dist.), this court found "no evidentiary basis to conclude that the police reports underlying the Brady claim were willfully or inadvertently suppressed by the prosecution[.]" *Id.* at ¶ 39. Postconviction counsel had averred that the evidence was obtained via a 2021 public-records request, but there was "no evidence to suggest that the police reports were not disclosed by the state during the discovery process utilized in 2003." *Id.* at ¶ 39. In *Kennedy*, unlike here, trial counsel did submit an affidavit. This court still found it deficient: "[Trial counsel] did not aver, for example, that the defense did not know about the police reports before Kennedy's trial in 2003 or that, if disclosed, the reports would have been incorporated into his defense at trial." *Kennedy* at ¶ 39. This court therefore concluded that "the documentary and inferential evidence incorporated into Kennedy's successive petition for postconviction relief does not establish that the disputed evidence was suppressed." *Id.* at ¶ 40, citing *Bethel*, 2022-Ohio-783. Thus, "Kennedy failed to demonstrate that he was unavoidably prevented from discovering the facts upon which his Brady claim relies." *Id.*

{¶ 39} *State v. Whatley*, 2024-Ohio-4909 (8th Dist.), also involved a public-records request. There, "Whatley's cousin made a public records request to obtain

the investigative file for Whatley's case." Whatley later filed both an untimely petition for postconviction relief and a motion for leave to file a motion for new trial claiming he was not aware of evidence contained in a certain police report. *Id.* at ¶ 3. This court characterized Whatley's arguments as a combination of "his unsupported belief that the State suppressed evidence within the police report he recently obtained, and because the evidence was 'suppressed,' he was not required to demonstrate that he was unavoidably prevented from timely obtaining the information." *Id.* at ¶ 5.

{¶ 40} This court, consistent with *Dye*, 2024-Ohio-3191 (8th Dist.), held that postconviction-relief claims based on alleged *Brady* violations generally "depend on the knowledge of trial counsel or the State's concession." *Id.* at ¶ 14.[3] This court continued:

> Instead of offering evidence that the information was suppressed or withheld, Whatley, similar to the offender in *Dye*, merely "offers his unverified belief that his counsel was unaware of the existence or the contents of the police report before trial." [*Dye*] at ¶ 28.
>
> Especially for the purposes of belated petitions for postconviction relief, "'[u]nsubstantiated, self-serving allegations are not sufficient to demonstrate entitlement to an evidentiary hearing.'" *Id.* at ¶ 27, quoting *State v. Walter*, 2020-Ohio-6741, ¶ 9 (8th Dist.), and *State v. Hill*, 2019-Ohio-365, ¶ 70 (1st Dist.). A *petition for postconviction relief must present some evidence demonstrating the unavoidably prevented prong of the analysis, including whether the State suppressed the evidence at issue.* [Emphasis added.] In this case,

---

[3] In *Dye*, this court noted that the lead trial attorney might be deceased and that "that appellant's other trial attorney was possibly disbarred and/or is unreachable out of state." *Dye* at ¶ 26, fn. 2. "[H]owever, this information was only offered during counsel's arguments. No evidence reflecting either attorney's whereabouts was offered with appellant's petition." *Id.* In the present case, appellant offered no affidavits whatsoever, even his own or of postconviction counsel, with respect to the availability of trial counsel.

Whatley presumes that the State withheld the evidence contained in the police report because his trial counsel failed to discuss that information at trial. According to Whatley, it would be "illogical to believe that defense counsel would not have used" the evidence at trial if he in fact had access to it.

Whatley's argument is purely speculative. There is no evidentiary basis to conclude that the police reports and any additional evidence in those reports were suppressed by the State in this particular case. . . . Whatley has not identified any evidence other than his self-serving, speculative assumptions that the State withheld any evidence at the time of his trial.

. . .

The trial court lacked jurisdiction to consider the petition for postconviction relief based on Whatley's failure to present evidence that the State suppressed any information contained in the police reports Whatley belatedly obtained.

*Id*. at ¶ 14-16, 18.

{¶ 41} In *Kenney*, 2025-Ohio-4841 (8th Dist.), yet another case involving a public-records request, the petitioner claimed he had been deprived of certain police reports with information favorable to his defense. Jones's arguments here with respect to the interoffice memorandum are somewhat analogous to Kenney's. Just as Kenney claimed that a testifying detective concealed exculpatory investigatory information by omitting it from his testimony, Jones claims that the prosecutor's memorandum suggests the State concealed exculpatory information suggesting that the occupants of the white car fired upon Jones and his codefendants. The information in *Kenney*, however, was far more compelling than the interoffice memorandum in the present case, which was prepared in connection with a separate criminal case by a prosecutor who did not even appear for the State at Jones's trial.

In the present case, the interoffice memorandum contains merely an offhand reference to a possible theory of the case, with no reference to police reports, witness statements, physical evidence, or indeed to any evidence whatsoever. The police report at issue in Kenney, by contrast, "included *witness statements* that someone other than Kenney was responsible for [the victim's] murder." (Emphasis added.) *Kenney* at ¶ 30. Kenney claimed "that a detective knowingly concealed information by omitting it from his testimony about [the victim's] murder investigation." *Id.* A private investigator submitted an affidavit in which she "ambiguously aver[red] that the information one witness shared with police 'was not *revealed during* [Kenney's] trial,' and Kenney maintain[ed] that these 'previously undisclosed facts' only became available to him in late 2021 or early 2022, following a public-records request." (Emphasis in original.) *Id.*

{¶ 42} The *Kenney* Court, however, rejected these arguments. It explained — consistent with this court's decisions in *Dye*, 2024-Ohio-3191 (8th Dist.) and *Whatley*, 2024-Ohio-4909 (8th Dist.)— that *Brady* suppression claims generally depend on the knowledge of trial counsel or the State's concession. *Id.* at ¶ 31. Like the cases discussed above, it rejected the notion that Kenney's unverified beliefs and unsubstantiated, self-serving allegations were sufficient to establish that the State had suppressed the evidence at issue, particularly for the purpose of establishing the "unavoidably prevented" prong of the analysis for untimely petitions for postconviction relief. *Id.* at ¶ 31. It continued:

Kenney provided no affidavits or other evidence detailing how and when he learned about the existence of the police reports, signed statements, and information contained therein; establishing that the police records were, in fact, suppressed; and explaining why he, his attorneys, or his private investigator could not have discovered this "new evidence material to his defense" sooner.

*Kenney* at ¶ 32.

{¶ 43} In the present case, Jones failed to present an affidavit from anyone with firsthand knowledge, including trial counsel, appellate counsel, or even from himself, indicating when he received the memorandum, how he received the memorandum, or otherwise supporting his claim that it was suppressed. *See Anderson*, 2025-Ohio-1254 at ¶ 13 (8th Dist.). To the extent he claims that the memorandum suggests the existence of other evidence that must have been suppressed, this is likewise insufficient under the line of cases discussed above. The memorandum does not refer to witnesses, police reports, forensic evidence, or indeed evidence of any sort. Jones "has not identified any evidence other than his self-serving, speculative assumptions that the State withheld" evidence. *Whatley* at ¶ 16. As the cases above make clear, this is fatal to his claim, because unverified beliefs and unsubstantiated, self-serving allegations "are insufficient to demonstrate that the State suppressed the evidence at issue, especially for the purposes of establishing the unavoidably prevented prong of the analysis for belated petitions for postconviction relief." *Kenney* at ¶ 31, citing *Whatley* at ¶ 14 and *Dye* at ¶ 26.

### b. Work Product

{¶ 44} We have already concluded that Jones failed to provide any affidavits from individuals with firsthand knowledge to demonstrate when and how he

received the memorandum, which would be necessary to support the claim that he did not possess it either in advance of trial or within the time period for filing a timely petition for postconviction relief. For purposes of thoroughness, however, we address the memorandum's lack of materiality to Jones's *Brady* claim. In short, even if Jones had established that he received the memorandum only yesterday, this would not have established a *Brady* violation.

{¶ 45} Jones is correct on one point: It does not matter, at this juncture, whether he obtained the interoffice memorandum by dubious means. What does matter, however, is the lack of any suggestion of a *Brady* violation at all given the nature of the memorandum — work product not subject to disclosure.

{¶ 46} We first address whether the State was required, at any point, to produce the assistant prosecutor's interoffice memorandum. Jones has cited no cases suggesting the prosecutor was obligated to do so. At the time of Jones's trial, Crim.R. 16(B)(2) provided, with exceptions not applicable here, that "this rule does not authorize the discovery or inspection of reports, *memoranda*, or other internal documents made by the prosecuting attorney or his agents in connection with the investigation or prosecution of the case." (Emphasis added.) The reason is straightforward: In 2001, as now under the even more explicit Crim.R. 16(J)(1), a prosecutor's memorandum is work product.[4]

---

[4] Crim.R. 16(J)(1), effective July 1, 2010, now expressly identifies "memoranda . . . or other internal documents made by the prosecuting attorney" as "subject to the work product protection."

{¶ 47} In the Fourth District case of *State v. Henry*, 37 Ohio App.3d 3 (6th Dist. 1987), the State refused to turn over a prosecutor's notes pertaining to a witness. In response to Henry's request, "[t]he prosecution responded that no statements existed and that the only material available was the prosecutor's notes which constituted work product." The Fourth District agreed, holding that its "review of the documents discloses that they are in fact the work product of the prosecutor. The documents consist only of notes taken by the prosecutor, which were not reviewed, adopted or signed by the witness." *Id.* at 8. *See also State v. Scoggins*, 2017-Ohio-8989, ¶ 39 (4th Dist.) (prosecutor's notes made during witness preparation that were not prepared, adopted, or signed by witness were not a written statement, but rather "clearly work product" protected from disclosure).

{¶ 48} The Seventh District relied upon both *Scoggins* and *Henry* in *State v. Thomas*, 2018-Ohio-3768 (7th Dist.), where it held that a prosecutor's notes were work product and that there was no duty to produce them:

> [A] prosecutor's notes of his discussions with witnesses are protected under Crim.R. 16 as work product. *Scoggins*, *supra*, at ¶ 38; *State v. Henry*, 37 Ohio App.3d 3, 523 N.E.2d 877 (6th Dist.1987), paragraph three of the syllabus. These holdings underscore that the state does not owe a duty to record or make a written summary of oral statements made by witnesses, but merely to provide recorded or written statements if these were otherwise recorded or written in the course of the investigation and do not amount to attorney work product.

*Id.* at ¶ 13. *See also State v. Canankamp*, 2023-Ohio-43, ¶ 76 (3d Dist.) (a prosecutor's notes made during witness preparation are work product protected from disclosure); *State v. Inman*, 2013-Ohio-3351, ¶ 26 (4th Dist.) (prosecutor notes of witness interviews are work product).

{¶ 49} The memorandum in the present case is even further removed from discoverability than the writings in *Scoggins*, *Henry*, *Thomas*, *Canankamp*, and *Inman*, which consisted of notes of communications with witnesses. The memorandum here does not refer to witnesses or forensic evidence. It is one assistant prosecutor's mental impression regarding an entirely different case than the subject of the memorandum. The State had no duty to turn over the interoffice memorandum. Jones cannot establish a *Brady* violation.

### c. The Additional R.C. 2953.23(A)(1)(b) Hurdle

{¶ 50} Even if Jones could establish that he was unavoidably prevented from obtaining the assistant prosecutor's memorandum by first establishing when he came into possession of the memorandum and that the State had unlawfully suppressed it under *Brady*, "his postconviction petition faces an additional jurisdictional hurdle[.]" *Bethel*, 2022-Ohio-783. Specifically:

> [U]nder R.C. 2953.23(A)(1)(b), he must show by clear and convincing evidence that no reasonable fact-finder would have found him guilty . . . but for constitutional error at trial. This question goes to the heart of Brady's third prong, which requires [a petitioner] to show that "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles* [*Kyles v. Whitley*, 514 U.S. 419, 433 (1995)], quoting [*United States v. Bagley*, 473 U.S. 667, 682 (1985).]

> The *Brady* standard does not require Bethel to show that disclosure of the . . . information would have resulted in his acquittal. *See Kyles* at 434. Nor does it require him to show that "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been [sufficient evidence] left to convict," *id*. at 434-435. Rather, [a petitioner] must prove that "in the context of the entire record," [*United States v. Agurs*, 427 U.S. 97, 112 (1976)], suppression of the . . . information "'undermines confidence in the outcome of the trial,'" *Kyles* at 434, quoting *Bagley* at 678.

*Bethel* at ¶ 31-32.  Thus, "[t]he question is whether we can have confidence in the jury's verdict even assuming" suppression.  *Id.* at ¶ 34.  "To answer that question, we must examine how [Jones] might have benefited from that information at trial."  *Id.*

{¶ 51} In other words, even if we were to determine that the prosecutor's interoffice memorandum was suppressed and that it found its way to Jones outside the statutory period for filing a timely petition, we would also need to conclude that this item was material.   "[T]he materiality of suppressed evidence must be viewed 'in the context of the entire record.'"  *Bethel* at ¶ 34, quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976).

{¶ 52} It is hard to discern how Jones could have benefited from possession of the memorandum at the time of trial or otherwise.  The memorandum's connection to this case is exceedingly tenuous.  On its face, it was not prepared in direct relation to Jones's case.  The author even identified the incorrect "Hill" brother being chased by the white vehicle, stating that "friends of one of the victims in Freeman's other capital case shot at a *Thurlin* Hill."  (Emphasis added.)  At trial, however, *Hurlon* Hill testified that the occupants of the white car chased him after he dropped his bike.  He further testified that he resided with his mother and his brothers, identifying one of his brothers as "Thurlon Hill." (Tr. 1059.)  There was no suggestion, however, that Thurlon Hill was at the scene.  In other words, the author of the memorandum not only referenced the wrong Hill brother but also spelled his

name incorrectly.[5]  At the very least, this misidentification of a key witness informs us that the memorandum's author lacked a thorough and accurate understanding of the facts underlying Jones's case.

{¶ 53} Moreover, even if we ignored this indicator of unfamiliarity and assumed the memorandum's author somehow knew Jones's case backwards and forwards, we cannot accept Jones's contention that the prosecutor's office operates as a hive mind where every assistant prosecuting attorney shares identical opinions about every other assistant prosecutor's cases.  Indeed, while the memorandum was directed to the county prosecutor with copies to seven other individuals, none of the recipients appeared as trial counsel in Jones's case.

{¶ 54} Even more importantly, Jones does not indicate how the memo could possibly be admissible into evidence or otherwise used at trial, i.e., who he would call as a witness, what questions would be permissible, or how the memo could be used to impeach any witness.  It is unlikely the court would have allowed the prosecutor himself to testify in the absence of personal knowledge of the underlying incident.  "The document to which [defense counsel] refers appears, at best, to be the prosecutor's work product in the form of handwritten notes on matters that might be included in a bill of particulars. . . . [T]he subject matter of the document would be neither evidence nor direct testimony." *State v. Cullers*, 2001-Ohio-1759, *18 (2d Dist. 2001).  Evid.R. 602 states that "[a] witness may not testify to a matter

---

[5] Hurlon was asked at trial to spell the name of his brother Thurlon.  He responded: "T-H-U-R-L-O-N."  (Tr. 1059.)

unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Jones had made no suggestion that the assistant prosecutor who authored the memo was at the scene or otherwise had any personal knowledge regarding the shooting. As a result, even if Jones had been in possession of the memorandum and had attempted to call the assistant prosecutor as a witness, the admissibility of any testimony would be dubious. Even in the absence of a privilege, "the witness will only be allowed to testify if he has personal knowledge of the matter." *Toledo v. Moore*, 2003-Ohio-2362, ¶ 21 (6th Dist.). In *Moore*, "the prosecutor stated he was not at the scene, and therefore, lacked the requisite personal knowledge in order to testify." *Id.*

{¶ 55} Also, the memorandum itself could not have been admitted for the truth of the matter asserted — that Jones and his codefendants "returned fire" — because even if defense counsel laid a foundation for authenticity, it is hearsay, double hearsay, or even further removed by additional layers of hearsay. Jones has not argued that any exceptions would apply, and it is unlikely any would. In *Bethel*, 2022-Ohio-783, the Ohio Supreme Court addressed, inter alia, an investigation report referred to as "Summary 86" that purportedly implicated another individual, Donald Langbein, in the double murder for which Bethel had been convicted. *Id.* at ¶ 14. The trial court "characterized Summary 86 as a 'cryptic double hearsay statement' that Bethel could not have used directly at trial under the Rules of Evidence." *Id.* at ¶ 33. The Ohio Supreme Court agreed, stating that Summary 86 could not have been used as either direct evidence or for impeachment:

Bethel could not have used the Withers information as direct evidence that Langbein (and not Bethel) murdered Reynolds and Hawk. The statements in Summary 86, which report what Withers had said to investigators, are double hearsay. And although Withers affirmed his statements in an affidavit and could have testified at trial, the statements are still hearsay because Withers merely repeated what Chavis had allegedly told him. Bethel argues that the Withers information would have undermined the state's case against him, but he does not identify any hearsay exception that would have allowed Chavis's purported statements to Withers to be introduced for the truth of the matter asserted. See Evid.R. 801, 803, 804. And Summary 86 could not have been used to impeach Langbein, because it does not involve a prior statement made by Langbein.

*Bethel* at ¶ 35.

{¶ 56} In summary, the interoffice memorandum is work product. There was no duty to disclose it. The prosecutor's office was not required to produce the interoffice memorandum, and the memorandum itself is not evidence. Despite Jones's unsupported declarations to the contrary, the memorandum does not reflect the position of the prosecutor's office with respect to the merits of his self-defense theory. It reflects that one assistant prosecutor authoring a memorandum on a different case somehow formed an impression that Jones and his codefendants "returned fire" on the occupants of the white vehicle. As discussed directly above, if the memorandum had been disclosed, Jones has pointed to no authority suggesting he could have used it at trial in any fashion.

{¶ 57} In connection with the "unavoidably prevented" discussion above, we reference Jones's argument that if he had enjoyed access to the memorandum in a timely fashion he could have asked for additional discovery regarding what evidence led this particular assistant prosecutor to memorialize his offhand impressions.

This species of bootstrapping, however, is foreclosed by this court's repeated rejection of self-serving and speculative assertions that something, somehow, must have been suppressed. Here, Jones is relying on non-*Brady* material — work product crafted in connection with an unrelated case, no less — to suggest that the State *must* have suppressed self-defense evidence. But Jones fails to state what that evidence might be, even by category, or to provide any support for his claim that the State suppressed any actual evidence. The interoffice memorandum contains no reference to what the assistant prosecutor relied upon when he wrote the sentence that Jones finds so enticing. Jones's argument that it must be something he did not receive in discovery is purely speculative. The State's pretrial disclosures included, inter alia, witness statements and police reports. Jones has not shown that evidence such as witness statements, police reports, or forensic evidence was actually or even arguably suppressed.

{¶ 58} Each defendant gave a statement that shots were fired from the white vehicle, and the self-defense theory offered by Jones and his codefendants was so thoroughly explored at trial that the jury sent two questions to the trial court with respect to self-defense instructions. (Tr. 1573 and 1586.)[6] Moreover, a police report turned over in discovery indicated that testifying witness L.C., who was W.C.'s sister, had initially believed that shots had been fired from the white vehicle. Jones

---

[6] The jury's first question asked the court to re-read certain definitions, including self-defense. (Tr. 1573.) The trial court instructed the jury again with respect to self-defense. (Tr. 1578-1584.) The second question likewise asked the trial court to re-read the self-defense instruction specifically, and the trial court did so. (Tr. 1586 and 1595-1605.)

correctly states that she changed her story at trial. In its direct examination, the State preemptively questioned L.C. concerning her initial report to police that she "thought [shots were] coming from the car that night." (Tr. 728.) L.C. stated that she did not see anyone in the vehicle with a gun or any flashes from the vehicle. (Tr. 728.) This, however, does not suggest that evidence was suppressed. It suggests the opposite, i.e., that the State turned over a potentially exculpatory police report and worked to ensure that the relevant witness clarified her account at trial.

{¶ 59} The assistant prosecutor's memo was circulated (again, to eight individuals not appearing for the State in Jones's case) a week before trial began. Assuming the assistant prosecutor who authored the memo even knew of the police report referencing L.C.'s statements, perhaps he thought that L.C. would testify consistently with the report. Perhaps the prosecutor's terse reference to Jones's case was based on assumptions that one or more witnesses might corroborate the defendants' statements that shots came from the car, which would hardly be a stretch based on what appears to be rival gang activity. Then again, perhaps the prosecutor's reference to returning fire was based on nothing more than water cooler conversation with other assistant prosecutors handling multiple matters and floating various case theories. If all of this sounds like rampant speculation based on unverified assumptions, that is precisely the point. The memo not only is not evidence, it does not even remotely hint that any underlying evidence was suppressed or that the jury's verdict would have been different. Neither the

existence nor content of the purportedly undisclosed memorandum undermines our confidence in the outcome of the trial.

{¶ 60} Finally, even though we have addressed the obstacles to using the memorandum in any fashion at trial, we briefly discuss Jones's argument that if his trial counsel possessed the interoffice memorandum at the time of trial, he was unconstitutionally ineffective in failing to utilize it. This court has described a petitioner's burden in this context as follows:

> In a petition for postconviction relief based on a claim of ineffective assistance of counsel, the petitioner bears the initial burden to submit evidentiary documents containing sufficient operative facts to demonstrate (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) that counsel's deficient performance prejudiced him, i.e., a reasonable probability that but for counsel's errors, the result of the proceeding would have been different.

*Kennedy*, 2024-Ohio-66, at ¶ 46 (8th Dist.).

{¶ 61} As explained above, this court recently rejected a *Brady*-adjacent ineffective-assistance argument in *Anderson*, 2025-Ohio-1254, at ¶ 10-13 (8th Dist.), based on the lack of affidavits from individuals with firsthand knowledge of what was or was not in trial counsel's possession. In addition, if trial counsel did not have the memorandum because it was suppressed in violation of *Brady*, then "'trial counsel could not have been ineffective for failing to investigate, develop, or present such evidence.'" *Jackson*, 2025-Ohio-2363, at ¶ 48 (8th Dist.), quoting *State v. Martin*, 2025-Ohio-144, ¶ 51 (11th Dist.). As discussed thoroughly above, Jones would instead need competent evidence supporting the fact of nondisclosure, or suppression in violation of *Brady*, and explaining both when and how the

memorandum later surfaced. He produced no such evidence and has failed to support his argument that there was a *Brady* violation.

{¶ 62} If trial counsel possessed the memorandum in advance of trial, Jones's claim is reduced to an ordinary ineffective-assistance claim based on evidence already available to the trial counsel. In that circumstance, he would fail to meet the threshold requirement for his untimely and successive petition because he was not "unavoidably prevented from discovering the facts that were necessary to establish an ineffective assistance claim." *State v. Kane*, 2017-Ohio-7838, ¶ 15 (10th Dist.). In other words, "'if the evidence was reasonably discoverable, then, by definition, the "unavoidably prevented" standard is not met.'" *Jackson* at ¶ 48, quoting *Martin* at ¶ 50. Jones's ineffective claim would then be reduced to nothing more than a new legal theory as opposed to a "new evidence" theory. "'R.C. 2953.23(A) contemplates the . . . discovery of new historical facts of the case, not new legal theories.'" *Kane* at ¶ 15, quoting *State v. Melhado*, 2006-Ohio-641, ¶ 19 (10th Dist.).

{¶ 63} In short, Jones cannot outflank the "unavoidably prevented" requirement by arguing in the alternative that if his trial counsel possessed the memorandum, the attorney was ineffective in not using it. Indeed, if trial counsel did possess the memorandum, but failed to utilize it, this could have been addressed in Jones's first petition for postconviction relief.[7] While invocation of the doctrine

---

[7] We acknowledge that the memorandum, which was neither part of the trial record nor referred to potential evidence known to Jones or his trial counsel, could not have been

of res judicata is not required to dispose of Jones's arguments, we note that this species of ineffective-assistance claim would be barred in this context. *See Kennedy* at ¶ 47 (Petitioner "is not entitled to a second opportunity to litigate his ineffective assistance of counsel claims in a successive petition merely because [he] failed to support his original petition with documentary evidence.").

{¶ 64} Jones also raises additional ineffective-assistance claims that do not implicate *Brady* in any fashion and could clearly have been raised on direct appeal or in a timely petition. He claims, for example, that there "were multiple statements made by witnesses . . . indicating that the males in the white vehicle had opened fire on [Jones and his codefendants]," and that trial counsel's "failure to use those statements and call those witnesses to testify at trial is not a strategic decision considering that evidence went directly to the heart of the defense that counsel sought to argue." (Appellant's brief at p. 21-22.) By noting that the statements were available and that trial counsel could have called these individuals as witnesses, he essentially concedes he was not "unavoidably prevented" from discovering this evidence and that an ineffective-assistance claim based on such evidence could have been raised, if not on direct appeal, then in his first petition. Indeed, this court observed in *Jones II* that even though the new witness affidavit "was not sworn until after [his] trial," Jones "[f]ail[ed] to allege . . . that the information provided in the witness's affidavit was not available at the time of his trial or his direct appeal[]" and

---

used to support an ineffective-assistance claim on direct appeal. *See, e.g., Jones II* at ¶ 6; *State v. Jackson*, 2017-Ohio-2651, ¶ 83 (8th Dist.).

did not provide an affidavit stating "that he himself did not discover this evidence until after the trial." *Id.* at ¶ 7-8. Instead, much like here, he claimed an available witness could have been called and that his counsel was ineffective in not doing so. *Id.* at ¶ 7-8. In light of that, this court concluded that Jones had failed "to present new evidence dehors the record concerning his counsel's actions" and that "[t]his issue could have been raised on direct appeal and is res judicata." *Id.* at ¶ 8.

{¶ 65} We find no merit to Jones's arguments concerning the interoffice memorandum or ineffective assistance of counsel.

### 2. Larissa Taylor's Affidavit

#### a. The "Unavoidably Prevented" Standard

{¶ 66} Jones's arguments regarding the affidavit of Larissa Taylor are more straightforward because they present no *Brady* issues. Once again, however, the lack of any affidavit from trial counsel, postconviction counsel, or even Jones himself that they were unavoidably prevented from discovering Taylor's potential testimony either prior to trial or within the deadline for filing a timely petition for postconviction relief precluded the trial court from exercising jurisdiction. In short, Jones failed to establish that he was unavoidably prevented from discovery of the facts upon which he relies.

{¶ 67} Taylor's affidavit is dated October 23, 2024, more than 23 years after the shooting. She avers that she was not interviewed by prosecutors and police in 2001 and did not come forward "at the time" because she was a minor and was afraid to become involved. She also avers that she was first approached by postconviction

counsel in June 2024 based upon a review of trial transcripts where she had been referred to by a witness who used her nickname, "Ressie."

{¶ 68} These details, however, "merely reveal[] when the affidavit was executed or provided, not when the testimony it contains became available." *Johnson*, 2024-Ohio-134, at ¶ 25. "Without an explanation of *how* the [new evidence] was discovered, the information essential to the R.C. 2953.23 inquiry remains cloaked in darkness." (Emphasis added.) *Id.* In *Johnson*, the Ohio Supreme Court held that "R.C. 2953.23(A)(1)(a) requires a petitioner to submit evidence of *specific facts* beyond the supporting affidavit's date to explain *why* the petitioner was unable to timely obtain an affidavit from the . . . witness." (Emphasis added.) *Id.* at ¶ 27.

{¶ 69} While Taylor's affidavit goes beyond indicating when it was executed or provided, it is nevertheless insufficient under *Johnson*. Taylor explains why she did not come forward in 2001 and notes that she was "tracked . . . down" and contacted in June 2024, but the affidavit contains no specific facts to demonstrate *why* Jones was unable to obtain her testimony either before trial or within the deadline for a timely petition for postconviction relief. In other words, it "provides no information about whether [Jones] had been prevented, unavoidably or otherwise, from timely discovering" Taylor's identity and potential testimony. *Johnson* at ¶ 29. "While [Jones] argues that he was 'unavoidably prevented from discovering this new evidence until the affiant[] came forward,' there is no evidence in the record detailing [Jones's] efforts, if any, to *timely* obtain the affidavit[] or

establish why those efforts would have been unsuccessful." (Emphasis added.) *Kenney*, 2025-Ohio-4841, at ¶ 26 (8th Dist.).

{¶ 70} Just as with the prosecutor's interoffice memorandum, there are no additional affidavits from Jones, his counsel, or from anyone else stating that Jones and his defense team did not know Taylor's identity prior to trial or prior to his first petition for postconviction relief. There were no affidavits specifically establishing when Jones or his defense team discerned her identity, how she was found, or otherwise supporting the notion that the defense was unable to locate and interview Taylor prior to trial or before Jones filed his first petition for postconviction relief. This lack of evidentiary support to satisfy the "unavoidably prevented" standard could conclude our inquiry:

> [T]he petitioner bears the burden of proving that he was unavoidably prevented from discovering the evidence on which he must rely, before the trial court even has subject-matter jurisdiction to consider the petition. . . . Therefore, it is the petitioner's duty to present sufficient evidence to carry that burden at the time he files the petition. And there is no practical reason why a hearing might be necessary for the petitioner to satisfy this burden. If testimony can be elicited at a hearing, it can be attested to in an affidavit.

*Johnson* at ¶ 26. *See also Kenney* at ¶ 32 (petitioner "provided no affidavits or other evidence detailing how and when he learned about the existence" of the evidence or "explaining why he, his attorneys, or his private investigator could not have discovered this 'new evidence material to his defense' sooner"); *Anderson*, 2025-Ohio-1254, at ¶ 13 (8th Dist.) (petitioner "failed to indicate when and how he obtained the reports and excluded any affidavits from people with firsthand knowledge, including himself").

{¶ 71} In addition to the absence of supporting affidavits, the record indicates that Taylor was known to at least two individuals on the State's witness list, Hurlon Hill and Lakeisha Staples. Regardless of whether Jones and his counsel actually knew of Taylor's identity and potential testimony prior to trial, "[i]t is the duty of the criminal defendant and his trial counsel to make a serious effort, on their own, to discover potential, favorable evidence." *State v. Collins*, 2020-Ohio-918, ¶ 45 (8th Dist.); *State v. Miller*, 2022-Ohio-378, ¶ 14 (8th Dist.). "'A defendant cannot claim that evidence was undiscoverable merely because the defendant or his defense counsel made no effort to obtain the evidence sooner.'" *McFarland*, 2022-Ohio-4638, at ¶ 25 (8th Dist.), quoting *Hubbard*, 2020-Ohio-2726, at ¶ 56 (8th Dist.).

{¶ 72} Even if we assume that the first clear reference to Taylor (by nickname) occurred during Staples's trial testimony, this does not change the analysis. Staples testified that she and Taylor were talking to Hill when the white vehicle approached. "The date of the trial transcript merely reveals when the trial testimony was provided, 'not when the testimony it contains became available.'" *Smith*, 2024-Ohio-1360, at ¶ 78 (8th Dist.), quoting *Johnson* at ¶ 25.

{¶ 73} Staples mentioned Taylor by nickname 11 times during her testimony. (Tr. 760-810.) Putting aside any unidentified obstacles to learning of Taylor prior to trial, this fact is relevant to any argument that Jones was unavoidably prevented from discovering her identity and potential testimony prior to filing his first motion for postconviction relief. "Evidence is not undiscoverable simply because no one looked for it." *Smith* at ¶ 78. There are no affidavits from anyone establishing what

steps, if any, were taken to track down "Ressie" after Staples mentioned her by nickname 11 times during her testimony — a path that could have led to Taylor, and thus a supporting affidavit, prior to Jones's first petition for postconviction relief.

{¶ 74} Finally, even if Jones could establish that he was unavoidably prevented from discovering Taylor and her potential testimony, he would still face the jurisdictional obstacle posed by R.C. 2953.23(A)(1)(b). We have already discussed the applicable standard. Here, even if Jones could somehow establish a constitutional error at trial in relation to Taylor — despite the fact that the Taylor affidavit does not implicate *Brady* — its content does not undermine our confidence in the jury's verdict. As the State notes, Taylor's affidavit directly contradicts the testimony of several witnesses, including Staples and Hill, as well as the statement that Jones himself gave to police.

{¶ 75} Specifically, multiple witnesses testified that the gunfire did not begin until after Hill dropped his bike and fled from the occupants of the white vehicle by running down Kelton, the white vehicle pursued him down Kelton, and the white vehicle then *returned* to the corner of Kelton and East 120th Street and ran over Hill's dropped bicycle. Hill testified that he heard no shots until he ran down Kelton, alerted Jones and his codefendants, and then ran to a backyard and crawled over a fence. Jones himself told police, in a written statement, that the white vehicle chased Hill down Kelton, that it came back and began firing upon him and his friends while it was still on Kelton, and that it "kept shooting at [them]" as it "got to East 120 & Kelton." (Appellant's petition exhibit No. 22.)

{¶ 76} Taylor, however, avers that she was talking to Hill and Staples at the southeast corner of the park (i.e., the corner of East 120th Street and Kelton) and that "during [that] conversation, [she] saw a white car . . . coming south down East 120th Street[.]" (Taylor affidavit at ¶ 4.) She then avers that "*[a]t that time*, [she] heard a series of shots coming from the car, fast in succession." (Emphasis added.) (Taylor affidavit at ¶ 4-5.) The white vehicle, she avers, then "passed by." (Taylor affidavit at ¶ 7.) In other words, Taylor claims she would have testified that the white vehicle approached her, Hill, and Staples on East 120th Street, that it immediately began firing shots while it was still on East 120th Street and she was still conversing with Hill and Staples, and that it then "passed by." As discussed above, this is inconsistent with multiple witness accounts — including the very individuals standing at the corner with Taylor — and with Jones's own statement to police regarding how the shootings occurred. Jones has not demonstrated, by clear and convincing evidence, that no reasonable factfinder would have found him guilty had Taylor testified or that her affidavit should otherwise cause us to lose confidence in the jury's verdict.

{¶ 77} Because we find no merit to Jones's arguments concerning either the prosecutor's interoffice memorandum or the Taylor affidavit, Jones's first assignment of error is overruled.

## B. Third Assignment of Error – Motion for Leave to File Motion for New Trial

{¶ 78} In his third assignment of error, Jones argues that the trial court abused its discretion in denying his motion for leave to file motion for new trial

pursuant to Crim.R. 33. As explained more thoroughly above, "'[t]he "unavoidably prevented" requirement in Crim.R. 33(B) mirrors the "unavoidably prevented" requirement in R.C. 2953.23(A)(1).'" *Bethel*, 2022-Ohio-783, at ¶ 59, quoting *Barnes*, 2018-Ohio-1585, at ¶ 28 (8th Dist.). *See also Johnson*, 2024-Ohio-134, at ¶ 16, fn. 3. We are therefore required to apply the "unavoidably prevented" analysis in the Crim.R. 33(B) context just as in the postconviction-relief context. *Allen*, 2024-Ohio-970, at ¶ 33 (8th Dist.), citing *Bethel* at ¶ 59.

{¶ 79} Moreover, "even if the offender demonstrates the 'unavoidably prevented' prong of the analysis, that alone is insufficient to demonstrate reversible error with the trial court's decision denying the motion for leave." *Whatley*, 2024-Ohio-4909, at ¶ 8 (8th Dist.). "If the hearing on a motion for new trial would be 'an exercise in futility' in light of decisions within the same case pertaining to a simultaneously filed petition for postconviction relief, no reversible error over the denial of leave has occurred." *Id.*, quoting *Bethel* at ¶ 59. *Bethel* therefore "establishes that appellate courts must consider the implications of any petition for postconviction relief in reviewing a motion for leave to file a motion for new trial in which the same arguments are advanced." *Whatley* at ¶ 9.

{¶ 80} We have already concluded that the trial court lacked jurisdiction to consider Jones's untimely, successive petition for postconviction relief because he failed to present affidavits demonstrating that he was unavoidably prevented from obtaining the proffered evidence. Jones failed to show that the State suppressed the prosecutor's interoffice memorandum or any other evidence in his case or that he

was unavoidably prevented from discovering Larissa Taylor and her purported testimony. The trial court here concluded the same, noting that Jones's arguments in support of his motion for leave to file motion for new trial mirrored his arguments regarding his untimely, successive petition for postconviction relief, and that the same "unavoidably prevented" standard applies. We find that the trial court did not abuse its discretion in denying Jones's motion for leave. Any hearing on a motion for new trial based on Jones's proffered new materials would have been an exercise in futility. Jones's third assignment of error is overruled.

## C. Second Assignment of Error – Res Judicata

{¶ 81} The trial court's discussion of the application of res judicata to Jones's untimely, successive petition for postconviction relief and his motion for leave to file motion for new trial is limited and somewhat unclear. To the extent we find, as discussed above, that the doctrine of res judicata is applicable to Jones's ineffective-assistance-of-counsel arguments, this assignment of error is overruled. In all other respects this assignment of error is moot based on our disposition of Jones's remaining assignments of error.

{¶ 82} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
DEENA R. CALABRESE, JUDGE

MICHELLE J. SHEEHAN, A.J., and
ANITA LASTER MAYS, J., CONCUR